UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                    Case No. 07-31044-DHW
                                         Chapter 7
COLBERT F. CLARK,

            Debtor.

J. LES ALEXANDER, III, Trustee,
and GENERAL ELECTRIC CAPITAL
CORPORATION,

            Plaintiffs,

v.                                       Adv. Proc. No. 07-3026-DHW

COLBERT F. CLARK and
LAURA J. CLARK,

            Defendants.

MEMORANDUM OPINION

General Electric Capital Corporation ("GECC") commenced this
action in state court in September 2006 to avoid as fraudulent two
conveyances of real property in Alabama and Florida made by the debtor
Colbert Clark to his wife, Laura Clark.  After the debtor filed a petition
under chapter 7 in July 2007, this action was removed to the bankruptcy
court. The chapter 7 trustee joined as co-plaintiff.[1]

The complaint asserts counts of actual and constructive fraud under
state law as to both conveyances.  The court granted summary judgment
in favor of Laura Clark on the constructive fraud count relating to the

_____

[1]  The co-plaintiffs reached an agreement regarding the sharing of a
recovery, if any, from this adversary proceeding.  The agreement was approved
by the court.

Florida property. The balance of the counts were tried on November 12, 2008. Upon motion of the defendants, a new trial was granted for the sole purpose of admitting additional documents into evidence. The parties submitted written closing arguments on the additional documents. Upon consideration of all of the evidence adduced, the court makes the following findings of fact and conclusions of law.

## Jurisdiction

This court's jurisdiction in this proceeding is derived from 28 U.S.C. § 1334 and from an order of the United States District Court for this district referring title 11 matters to the Bankruptcy Court. See General Order of Reference of Bankruptcy Matters (M.D. Ala. Apr. 25, 1985). Further, because this is a core proceeding under 28 U.S.C. § 157(b)(2)(H), this court's jurisdiction extends to the entry of a final order or judgment.

## Alabama Residence

The debtor and his wife purchased real property located at 123 Girard Avenue, Dothan, Alabama in March 2001 for $385,000. They made a down payment of $110,000 and secured a loan of $275,000. In connection with the transaction, the house was appraised at $393,000 despite a tax appraisal of only $262,500. They purchased the home with joint funds. There was no intent at that time that the home would be owned solely by Laura.

The Clarks made extensive renovations to the residence. Laura Clark took responsibility for overseeing the renovations. She alone employed, instructed, and paid the workmen. She wrote the checks for the renovations from a joint checking account with her husband.[2] Between August 2002 and May 2003, payments to a single contractor totaled

---

[2] The debtor testified at first that Laura earned the money that went into the account. He later testified that some money earned by him was also deposited into the account.

2

$324,206.61.

After commencing renovations, Laura Clark asked her husband to transfer his undivided one-half interest in the house to her. She testified that she wanted to devote substantial sums from her separate funds to improve the home. However, the two were having marital difficulties, and she was concerned that, in the event of a divorce, she could effectively lose this money.

The Clarks asked their attorney to prepare a deed conveying his one-half interest to her. They signed and notarized the deed in their attorney's office in December 2002. No consideration was paid for the transfer. Due to miscommunication with their attorney, the deed was not recorded.

Laura Clark refinanced the home on October 14, 2003 in her name with Hamilton Mortgage Corporation on October 14, 2003 with a loan in the amount of $393,000.[3] Both Colbert and Laura Clark signed the new mortgage which was recorded on October 27, 2003. An unsigned settlement statement reflects that from the loan proceeds, $270,083.88 was paid to Chase Manhattan, the first mortgagee, $122,624.26 was paid to SouthTrust Bank, and $765.06 was paid to the Houston County Tax Collector.[4] Though Colbert and Laura both signed the mortgage, only Laura was liable on the note.

Colbert testified that the debt to SouthTrust Bank was a joint line of credit established to fund renovations of the residence. However, it is not clear that SouthTrust held a mortgage on the property. There are two unsigned Uniform Residential Loan Applications produced post-trial. The one dated October 10, 2003 reflects that liens on the property total 387,674. The one dated October 13, 2003 reflects that liens on the

---

[3] She testified that she refinanced the home due to lower interest rates.

[4] The proceeds disbursed plus the settlement charges exceed the loan amount. It appears that Laura and/or Colbert paid the difference.

3

property total only $267,674, the approximate amount of the debt to Chase Manhattan, holder of the first mortgage.

At the time of the refinance, the house was appraised by Houston County for tax purposes at $684,200. However, the appraisal made by Pilcher & Associates for the mortgagee in connection with the refinance values the property at $880,000 as of October 2003.[5]

A title search performed in connection with the refinance revealed that the December 2002 deed had not been recorded. The Clarks' attorney again prepared a warranty deed conveying Colbert's undivided one-half interest to Laura. The deed was signed on October 21, 2003 and recorded on October 29, 2003. No consideration was paid. There is no evidence that the Clarks disclosed this transfer to the new mortgagee although required by the mortgage.

According to Laura, they moved into the home during the first part of 2003; according to Colbert, they moved into the home in late 2003 or early 2004. The renovations were not complete when they moved in. Work on the third floor had been stopped. The third floor had been intended for their son who died at 3 months of age in February 2002. At his death, they stopped work on the third floor and did not recommence the work until after they moved into the house. They completed the third floor in mid-2004. The debtor testified that he was completely uninvolved in these renovations. Laura Clark testified that the renovations to the house

---

[5] During the summary judgment process, the Clarks contended that the residence had a value of only $400,000 in October 2003. The Clarks never directly disclosed that the property had been appraised for $880,000.

The $880,000 figure is contained in a Uniform Residential Loan Application. This is presumably the appraised value established by Pilcher & Associates who received the appraisal fee reflected on the settlement statement.

4

were pretty much complete, except for the third floor, by October 2003.[6]

The parties stipulate that the debtor was insolvent on October 1, 2003 as the sum of his liabilities exceeded the value of his assets at fair value. He remained insolvent as of the date of trial. Multiple creditors who held unsecured claims against Colbert Clark in his chapter 7 case held unsecured claims against him as of October 21, 2003, the date of the transfer.

Great American Insurance Company ("GAIC") filed an action against the debtor in November 2003 and recorded a judgment in the amount of $5,952,924.35 on March 5, 2004. On October 22, 2004, De Lage Landen Financial Services filed an action to avoid the transfer of the Dothan residence as fraudulent.[7] GAIC, a prior lienholder, was substituted for De Lage Landen as plaintiff in the fraudulent conveyance action.[8]

The action was resolved with a consent order in July 2005 without admission that the transfer was fraudulent. Laura Clark paid GAIC $170,000 to settle the action. No appraisal of the property was made at that time. Laura Clark testified that the figure was arrived at by taking the tax-appraised value, subtracting the mortgage, and dividing by two.

The Clarks continued to improve the home. In August 2005, Laura Clark bought an adjacent lot jointly with a neighbor and installed a pool and a guest house. She paid $52,000 for the lot. The improvements included perimeter fences, limestone decking and fountain, playhouse, lighting, extensive landscaping and another driveway with gas lamps and brick and

---

[6] The evidence is not clear whether work on a second floor bonus room was complete before they moved into the house.

[7] De Lage Landen recorded a judgment against the debtor in the amount of $1,665,841.71 on September 9, 2004.

[8] GAIC recorded its $5.9 million judgment in March 2004; De Lage Landen Financial Services recorded its $1.6 million judgment in September 2004.

5

iron posts.  She spent about $350,000 to $400,000 of her own money on these improvements.

In February 2006, Laura Clark transferred the Dothan residence by warranty deed to a third party for $1.3 million. The debtor did not receive any of this money.  After payment of the $300,000 balance on the mortgage, Laura received $1 million.

GECC obtained a judgment against the debtor in the amount of $600,000 in November 2005 and recorded the judgment on May 14, 2007. The judgment was based on loans to the debtor's company, Clark Crane, LLC, in 2001 and 2002 that the debtor guaranteed.  The debtor filed a petition under chapter 7 on July 11, 2007.

### The Debtor's Financial Condition

The Clarks were married in 1994.  Colbert Clark owned and operated several businesses.  Clark Construction Company, Inc., was an S-corporation.  Clark Construction focused primarily on bridge and foundation work but also did a limited amount of commercial work.  Clark Crane was an equipment rental company with 50-60 employees and cranes for lease.  Colbert also owned Structural Foundations and a Sale/Equipment Rental business.

Shortly after they were married, Laura Clark started her own construction company, an S-corporation.  She funded the venture with her own credit.  She was a sharp business woman, and her business did very well.[9]  Beginning in 1998, the company worked solely on government projects.  In connection with that work, Laura obtained surety bonds and construction loans that she personally guaranteed.

Laura Clark wrote the checks for the expenses of the household,

---

[9] At one point her company had 165 employees.  The gross revenue in 2004 was $90 to 100 million; it was the company's largest year.

6

including the mortgage, from a checking account joint with her husband. She managed the money for the household. She testified that the funds in the account were earned by her.[10]

Colbert testified that he had no financial problems in 2000 and that Clark Construction had over 50 million in outstanding bonded work. In 2002, he got the largest job that Clark Construction had ever had. In 2002-2003, an accounting firm issued a financial statement reflecting that Clark Construction was solvent. Losses suffered in 2001 and 2002 were attributable to equipment purchases and depreciation. According to Colbert, financial problems with his business did not arise until the first part of 2003. That's when he realized that he had more problems than he thought he could handle.

However, another accounting firm concluded in June 2003 that Clark Construction had a negative $3 million shareholder's equity as of December 2002. Tax returns reflect that in 2002, Clark Construction lost about 6.4 million, Structural Foundations, Inc. lost $312,000, and the Sale/Equipment Rental company lost about $3.3 million. When asked if he was aware of this $10 million loss in 2002, he responded that he didn't see these returns until they were filed in 2003. He stated that he did not use monthly financial statements – only quarterly. He knew the businesses were struggling, but he did not know the actual loss amount. From February to September 2002, following the death of his son, his senior vice-president operated Clark Construction in his place. Colbert took time off to attend to personal matters.

In December 2002, he and Laura discussed putting the marital residence in her name. The debtor testified that Laura wanted to continue the renovations but was wary of putting additional money into the residence due to their marital difficulties. They executed a deed on December 3, 2002, which, as stated above, was never recorded.

-----

[10] As stated earlier, Colbert testified that some money earned by him was also in the account.

At the end of 2002 or beginning of 2003, Colbert advised GAIC that he was having serious financial problems and needed additional bonding. He entered a forbearance or restructuring agreement with GAIC and SouthTrust Bank, two of his major creditors. The bank gave him an additional $1 million working capital. GAIC injected $3 to 4 million into the business, and Colbert personally assumed $3.7 million in debt. He received $30 million additional bonding and a personal loan which he used to pay outstanding debt. Under the restructuring agreement, the debtor was prohibited from drawing a salary from Clark Construction after April 2003.

As part of the agreement, GAIC required a mortgage on the Clarks' Florida townhouse. Colbert told his wife that this was a workout plan to get additional bonding. After a heated conversation, she reluctantly agreed to mortgage her interest. The townhouse had been purchased with her separate funds.

Clark Construction was the contractor for the Houston County Courthouse, and GAIC was the bonding company. Sometime around October 2003, the county terminated Clark Construction. Laura Clark's construction company was asked to finish the project, and GAIC fostered this transition.

The workout plan with GAIC and SouthTrust did not succeed. GAIC filed suit against Colbert for almost $6 million on November 7, 2003. He testified that he did not tell his wife about the lawsuit – despite the fact that her interest in the townhouse was at stake. It was his business and not hers, and he wanted to solve the problems on his own.

De Lage Landen had already filed suit against Colbert for over $2 million on October 3, 2003. He was served October 8, 2003. In addition, Lesco had obtained a default judgment in the amount $14,954.84 in September 2003, and in October 2003, Southern Equipment Rental obtained a default judgment in the amount of $373.66. The debtor's schedules reflect over $500,000 in outstanding tax liabilities incurred

Case 07-03026   Doc 75   Filed 03/13/09   Entered 03/13/09 15:53:41   Desc Main
Document   Page 8 of 25

during the 1999 to 2003 time frame. He was served in October to November 2003 with an amount due. In addition, GECC sent a demand notice dated October 14, 2003 to Colbert stating that Clark Crane, LLC owed over $2 million, which he personally guaranteed. He testified that he didn't tell his wife about any of this.

Tax returns reflect that in 2003, Structural Foundations lost about $400,000, the Sale/Equipment Rental business lost about $4 million, and Clark Construction lost about $9 million.

Colbert testified that he "really felt the hammer" in November 2003, but until October 2003, he was still bidding jobs, getting new work and had a $30 million bond line. He testified that he operated Clark Construction until the end of 2003 and had employees into November 2003 and received progress payments for ongoing work "probably" through December. The debtor's schedules reflect that Clark Construction ceased business in October or November 2003. He testified that he operated Clark Crane until September 2004.

Laura Clark testified that she first knew of Colbert's financial problems when he asked her to mortgage her interest in their Florida condo in 2003 in connection with the forbearance agreement. However, she understood this was in the nature of restructuring and she knew significant funds had been advanced for the company to go forward. She did not realize his problems were severe until GAIC (around February 2004) brought an action to foreclose their interest in the condo.

She was aware of problems with the Houston County Courthouse project in 2003 – indeed, her company completed the project. However, she thought this was one of Colbert's smaller projects. She was not aware of the lawsuits filed against her husband.

Laura testified that the joint tax return that she signed with her husband was not a red flag for her. Tax returns were not her "forte," and she was more interested in the bottom line of how much tax was owed.

She did not question Colbert about the losses reflected.

Les Alexander, trustee of Colbert Clark's chapter 7 bankruptcy estate testified at the trial regarding Clark's financial condition prior to October 2003. In the summer of 2004, Alexander was retained by SouthTrust Bank, a secured creditor, to perform a historical analysis of the financial condition of Clark Construction. SouthTrust was considering a possible lawsuit against the company's accounting firm.

Alexander testified that Clark Construction began having problems during 2000. Clark Construction was running behind schedule and over costs significantly and was not in compliance with debt covenants. The company was beginning to spiral down by the end of 2000. He described the company as being in wind-down or liquidation mode early in 2001 and insolvent by the end of 2001. Losses amounted to $4.4 million in addition to what was reflected in the financial statements. The business never emerged from insolvency after that time.

Colbert's schedules reflect $19.4 million total liabilities and assets of $11,950. Ninety-five percent of the liabilities are listed as unsecured debt. Colbert personally guaranteed the debts of Clark Construction.

## Value of Residence

Both the plaintiffs and the Clarks presented retrospective appraisals as evidence of the value of the property in October 2003, the time of the subject transfer. The plaintiffs offered the appraisal and testimony of William Bliss, and the Clarks offered the appraisal and testimony of Stewart Lee. Both appraisals were made in 2008 in preparation for trial and were therefore "retrospective." An analysis of the appraisals follow.

Bliss has been an appraiser since 1982 and is a certified senior residential appraiser. He lives outside the Dothan area. He was unable to view the interior in connection with the appraisal because the home is no longer owned by Laura Clark. He did have an opportunity to view the

property from the road. He described it as a "mansion" with approximately 7,300 to 7,400 square feet. The property is located within the "Garden District" in Dothan. The Garden District contains prestigious, established homes. Houses turn quickly and do not come on the market often. The appreciation rate within the district was phenomenal before the recent downturn in the economy.[11]

Bliss interviewed several real estate people in the area and learned that renovations to the Clark home were complete as of October 2003. One such person was Marla Ezell who appraised the property in 2006 in conjunction with the proposed sale for $1.3 million. Based on the interviews, he concluded that the property was in immaculate condition in October 2003. The quality of construction was "as good as could be found."

He determined the square footage of the property in October 2003 by these interviews and also from the records at the county courthouse. The records at the courthouse indicated a square footage of 7,444. However, for his appraisal, he used the figure 7,356 provided by Ezell, because she had actually been inside and measured the home in 2005. Stewart Lee had assisted Ezell in obtaining the measurement. Bliss had indicated to Ezell and Lee that he needed the square footage of the home as of October 2003.

Bliss also gathered comparable sales from as many sources as he could. He analyzed them based on price per square foot to see what the indicated value range would have been in 2003. He evaluated eight comparable sales, some before 2003 and some after. Only one of the comparable sales took place within the Garden District.

Bliss determined that three of the sales were "most" comparable to the Clark home, based on design, appeal, and quality of construction.

---

[11] He noted, however, that the Garden District lacked the number of sales necessary to calculate the appreciation rate.

Case 07-03026   Doc 75   Filed 03/13/09   Entered 03/13/09 15:53:41   Desc Main
Document   Page 11 of 25

None of these three homes were located within the Garden District. All were built in the 1990s. He concluded that the extensive renovations made by the Clarks lowered the effective age of their house, which was built in 1946.

The three homes he deemed most comparable ranged from $140 to $170 per square foot. Because the sale prices of the homes occurred in 2005 – after the October 2003 effective date, he employed a $130 to $140 price per square foot to arrive at a value range for the subject property.[12]

He concluded that the subject property was worth between $950,000 to $1 million in October 2003. He did not include any value for the outside improvements made in 2005.

He tested this value range against the tax records of the county for this property. He noted that when the property sold in 2001, the tax assessor's value was 68.2% of the actual sale price of $385,000. He also noted that when the property sold in 2006, the tax assessor's value was 60.6% of the actual sale price of $1.3 million. In October 2003, the tax assessor valued the property at $684,200 or 68% of $1,000,000, the upper figure of his value range.

The Clarks offered the appraisal and testimony of Stewart Lee. Stewart Lee has lived in the Dothan area all of his life and has been a real estate appraiser since 1995. He is a certified residential appraiser. He has

---

[12] The three sales took place from May 2005 to August 10, 2005. Bliss did not feel that the market had changed significantly from October 2003 to August 2005. He adjusted the range downward to account for appreciation occurring after October 2003.

The sale from the Garden District was not truly comparable. It was smaller with a lower quality of construction. However, Bliss adjusted the sales price of that home upwards from $445,000 to $545,000 to compensate for the lower quality of construction, and he arrived at a price of $144 per square foot which supported his square foot value range for the subject property.

12

been inside the subject home on five to six occasions during various stages of renovation. All but one of those visits were social. He confirmed that the house was in very good condition. He stated that homes in the Garden District averaged 40-50 years and were of varying sizes and styles of construction. They are custom built with low turnover. It is a premium area with premium prices.

He did not see the entire home until he helped Marla Ezell measure the home around the end of 2005. At that time, the total square footage, including all three floors, was 7,356. Lee, like Bliss, had no personal knowledge of the square footage of the home in October 2003. However, Lee understood that the square footage was less in October 2003. Therefore, he reduced this figure by the area of the hallway and bonus room on the second floor and the finished area on the third floor which he understood were not complete in October 2003. He reached this understanding from talking with Colbert. He arrived at a square footage of slightly over 6,007 as of October 2003. His examination of the county records revealed a square footage of 6,604. He suggested the county's number may not be accurate because their figures are based on estimates – not actual measurements for the second floor and because they use a factor to figure the square feet of the third floor.

Lee, too, used comparable sales to arrive at a value range of the subject property in October 2003. He did not use any sales in 2005 because he thought they were too far beyond the effective date of the appraisal and because the market was different in 2005.[13] He did use one comparable from March 2004. He adjusted the sales price of each comparable to account for things such as site value, size, and amenities (such as garages, pools, outside buildings). He arrived at an adjusted range of between $513,000 to $709,000. However, he concluded that three sales were the most comparable to the subject due to size and quality.

_____

[13] He confirmed Bliss's testimony that appreciation occurred in the Dothan market between 2003 and 2005. The highest sale in the Dothan area by October 2003 was $900,000.

Case 07-03026    Doc 75    Filed 03/13/09    Entered 03/13/09 15:53:41    Desc Main
Document    Page 13 of 25

Therefore, he weighed these the heaviest. He then reached a value range for the subject.

He concluded that the value of the subject as of October 2003 was between $675,000 and $700,000 based on 6,007 square feet of heated and cooled living area.

As stated above, the court granted a new trial for the purpose of admitting additional documents into evidence. One of these documents is an unsigned settlement statement from Laura's refinancing of the property in October 2003. The statement reflects an appraisal fee of $300 to Pilcher & Associates. The Clarks did not produce a copy of the appraisal made by Pilcher & Associates. However, the unsigned Uniform Residential Loan Application dated October 13, 2003 contains a section titled "Assets and Liabilities." In this section, the market value of the property located at 123 Girard Avenue is listed at $880,000. If this is the value ascribed by Pilcher & Associates, it represents an appraisal made contemporaneously with the refinancing and the transfer of the property to Laura Clark.

## Florida Townhouse

The debtor and his wife purchased a townhouse unit located at 4400 Kingfish Lane #321, Panama City, Florida, in or around 2002. Laura Clark paid $250,000 for the townhouse with her separate funds, but the Clarks were listed as joint owners. In May 2003, the Clarks mortgaged the townhouse to GAIC as partial security for around $3.8 million in loans to the debtor. The property was obligated up to the amount of $450,000. A September 2003 appraisal fixed the value of the home at $287,500. This appraisal did not include the contents. The debtor defaulted on the loans, and GAIC brought an action in February 2004 to foreclose the interest of the Clarks in the townhouse.

In July 2004, the parties settled the action. Laura Clark paid GAIC $170,000 from her separate funds to release its mortgage, and the foreclosure action was dismissed. In connection with this settlement, the

14

debtor executed a quitclaim deed of his interest in the property to Laura Clark. The Clarks assert that the townhouse was worth between $325,000 to $350,000. The townhouse was assessed for tax purposes at $317,000. The parties stipulate that the value of Colbert's equity in the townhouse on July 16, 2004 was approximately $170,000, the amount that Laura paid to release the lien.

Alabama Fraudulent Transfer Act
Actual Fraud

Under Alabama law, a "transfer made by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer with the actual intent to hinder, delay, or defraud any creditor of the debtor." *Ala. Code* § 8-9A-4(a). To determine actual intent, the statute provides a non-exhaustive list of factors to consider:

> (B) In determining actual intent under subsection (a), consideration may be given, among other factors, to whether:
> (1) The transfer was to an insider;
> (2) The debtor retained possession or control of the property transferred after the transfer;
> (3) The transfer was disclosed or concealed;
> (4) Before the transfer was made the debtor had been sued or threatened with suit;
> (5) The transfer was of substantially all of the debtor's assets;
> (6) The debtor absconded;
> (7) The debtor removed or concealed assets;
> (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;
> (9) The debtor was insolvent or became insolvent shortly after the transfer was made;
> (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Ala. Code* § 8-9A-4(b).

## Alabama Residence

The plaintiffs contend that the debtor transferred his interest in the marital home with the "actual intent to hinder, delay, or defraud" a creditor of the debtor. The plaintiffs point to the following facts relevant to the factors from the statute: the transfer was to an insider – the debtor's wife; the debtor retained possession and use of the property following the transfer ; though the deed was recorded, there is no evidence that the debtor disclosed the transfer to the mortgagee or any of his creditors; the debtor had already been sued or threatened with suit; he had already been served with the $2 million lawsuit by De Lage Landen, and the next month was served with an almost $6 million lawsuit by GAIC; other than the Florida townhouse, this was the only real property owned by the debtor individually; his business assets were heavily encumbered; no consideration was paid for the transfer; the debtor was insolvent when the transfer was made; and the transfer was made in the face of a massive debt load in the tens of millions of dollars. These facts are relevant to eight of the eleven factors enumerated by the statute.

As the plaintiffs point out, the issue is the intent of the debtor at the time the transfer is made. In the instant case, that date is October 2003.

However, the debtor first transferred the home to his wife in December 2002. That transfer was not recorded and was not effective against third parties. The Clarks testified, and the court finds credible, that the December 2002 transfer was made at the insistence of Laura Clark as a measure of protection for the substantial amount of her separate funds that she planned to dedicate to renovating the residence.

16

Laura wanted this protection because they were having marital troubles. She feared losing the benefit of this investment in the event of a divorce. And it was a substantial investment. Accepting her figures, she spent on renovations almost two times the purchase price of the house.

After Colbert executed the December 2002 deed, Laura continued making renovations to the property and continued making the mortgage payments. Although she paid for the renovations and mortgage payments from a joint account, it appears that the money in the account came primarily from Laura.

Laura sought to refinance the property in 2003 to take advantage of lower interest rates. It was only then that she learned that the December 2002 deed had not been recorded. Colbert again executed a deed to the property, and Laura continued with the renovations and mortgage payments.

The court concludes that the debtor did not intend to "hinder, delay, or defraud" his creditors at the time of the October 2003 transfer. The debtor merely intended to make effective that which had already been attempted in December 2002.

The debtor's financial condition was very clear in October 2003 – he was admittedly insolvent. In December, 2002, although the debtor was in deep financial trouble and may have been insolvent, the debtor did not know the extent of his financial troubles. Until 2003, the debtor believed he was experiencing a trough out of which he would be able to climb.

Many of the factors enumerated in the statute weigh in favor of a finding of actual fraud in this case. However, the court also considers facts peculiar to this case – that the transfer was made during a time of marital uncertainty when the wife intended to and did invest substantial sums of her separate funds to renovate and pay for the home. These facts weigh more heavily against a finding of actual fraud.

17

For the above reasons, the court concludes that the debtor did not transfer his interest in the marital home to his wife with the "actual intent to hinder, delay, or defraud" a creditor of the debtor.

Florida Townhouse

The plaintiffs contend that the debtor transferred his interest in the marital home with the "actual intent to hinder, delay, or defraud" a creditor of the debtor. Under Florida law,

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

*Fla. Stat. Ann.* § 726.105(1)(a) (1997). To determine actual intent, the Florida statute provides a non-exhaustive list of factors virtually identical to those included in the Alabama statute. *See Fla. Stat. Ann.* § 726.105(2).

Most of the factors considered with regard to the transfer of the Alabama residence remain relevant to the transfer of the Florida townhouse. However, the facts differ with regard to the Florida townhouse in a very important respect. The parties stipulate that the value of the debtor's equity in the townhouse on July 16, 2004 was approximately $170,000. Laura, therefore, paid the reasonably equivalent value of the debtor's interest in the property in exchange for the transfer. Although the money was paid to GAIC, the money inured to the debtor's benefit because it released, dollar for dollar, the debtor's obligation to GAIC. Only the debtor was liable on the note to GAIC.

In addition, the transfer did not "hinder, delay, or defraud" any creditor. To the contrary, the transfer effectively liquidated the debtor's

18

interest in the property for the benefit of a creditor – GAIC. In addition, the transfer reduced the debtor's overall indebtedness.

The court concludes that the debtor did not make the transfer with the actual intend to hinder, delay, or defraud any creditor. Nor did the transfer have that effect.

## Constructive Fraud

A transfer may be fraudulent if the "debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor:"

> (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (2) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

*Ala. Code* § 8-9A-4(c)(1) and (2). In addition,

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer.

*Ala. Code* § 8-9A-5(a).

## Alabama Residence

Under *Ala. Code* § 8-9A-5(a), a transfer is fraudulent as to a creditor

whose claim arose before the transfer if (1) the debtor made the transfer without receiving reasonably equivalent value in exchange and (2) the debtor was insolvent at the time. The debtor transferred his interest in the marital home to his wife on October 29, 2003. It is stipulated that on that date there were multiple creditors with unsecured claims against the debtor and that the debtor was insolvent.

The only element for decision is whether the debtor received reasonably equivalent value in exchange for the transfer. This issue raises the question – what was the value of the debtor's interest in the home on the date of the transfer?

At the time of the transfer, the house was appraised by Houston County for tax purposes at $684,200. Before trial, the Clarks did not produce any evidence of the appraisal made in conjunction with the October 2003 refinance, despite multiple requests from the plaintiffs. The plaintiffs were forced to obtain and proffer a retrospective appraisal made in 2008 in preparation for trial. The Clarks also proffered a retrospective appraisal.

As discussed above, the retrospective appraisals varied widely. Bliss concluded that the property was worth between $950,000 to $1 million in October 2003. Lee concluded that the property was worth between $675,000 and $700,000. The appraisals are about $300,000 apart.

Part of the variance is attributable to the different understanding held by each appraiser regarding the square footage of the property in October 2003. Bliss understood that the square footage of the home was complete in October 2003. He used the 7,356 square footage number given to him by Ezell. Lee understood that neither the 2nd nor 3rd floors were complete in October 2003. He estimated the square footage at 6,007.

Both appraisers may have been incorrect in their understanding. Laura Clark is the person most knowledgeable about the renovations to the home. She ordered, supervised, and wrote the checks for the renovations.

Case 07-03026   Doc 75   Filed 03/13/09   Entered 03/13/09 15:53:41   Desc Main
Document   Page 20 of 25

Colbert testified that he was not involved in the renovations. Laura testified that by October 2003, the basic square footage of the home was complete except for the 3rd floor. Therefore, Bliss should have excluded the 3rd floor from his appraisal, and Lee should have included all of the 2nd floor.

After the trial, evidence was admitted indicating that an appraisal of the home was made by the mortgage company in October 2003 in connection with Laura's refinance of the property. This appraisal fixed the value of the home at $880,000. This appraisal is entitled to more weight than the appraisals of Bliss and Lee because it was made contemporaneously with the transfer.

A retrospective appraisal can present special challenges. It's accuracy may be tainted by the appraiser's knowledge of the market following the effective date of the appraisal. In addition, a retrospective appraisal may be tainted by questions regarding the subject property on the effective date – like square footage. If Bliss and Lee had shared similar understandings of the square footage as of October 2003, they would have arrived at closer values. Bliss would have arrived at a lower value, and Lee would have arrived at a higher value.

The $880,000 appraisal is likely more accurate both because it was made contemporaneously with the transfer and because it is not tainted with square footage issues. In addition, this figure lies between the values established by the retrospective appraisals. The court concludes that the value of the marital home in October 2003 was $880,000.

At that time, the home was encumbered by a mortgage to Chase Manhattan in the amount of $270,083.88. In addition, it appears that the home was encumbered by a second mortgage to SouthTrust Bank in the amount of $122,624.26.[14] The unsigned settlement statement from the

---

[14] As noted above, two unsigned Uniform Residential Loan Applications were produced post-trial. The one dated October 10, 2003 reflects that liens on the property total 387,674. The one dated October 13, 2003 reflects that liens

refinancing in October 2003 reflects that $122,624.26 was paid to SouthTrust Bank from the refinance proceeds. It is typical to pay outstanding mortgage liens from refinance proceeds. It is not typical to pay unsecured claims from refinance proceeds. Therefore, for purposes of this decision, the court will assume that SouthTrust Bank held a lien on the property in October 2003. If this is not correct, the court invites reconsideration with proof to the contrary.

The mortgages to Chase Manhattan and SouthTrust Bank totaled $392,708.14 in October 2003. Deducting the balance of the mortgages from the value of the property, the Clarks had $487,291.86 equity in the home in October 2003. The value of the debtor's interest in the property was one-half of the equity, or $243,645.93.

The second question arises – did the debtor receive "a reasonably equivalent value in exchange for the transfer" of his one-half interest? It is undisputed that the debtor did not receive any value for the property on the date of the transfer. However, Laura contends that the debtor received much more than the reasonably equivalent value of the property through the money that Laura spent on renovations. The Clarks rely on *Southern Slag Products Co. v. Thomas*, 413 So. 2d 1073 (Ala. 1982) and *Champion v. Locklear*, 523 So.2d 336 (Ala. 1988), fraudulent transfer cases between spouses decided under Alabama law. The court in *Southern Slag* stated:

> In order to meet the requisite burden of proof, the grantee/spouse is not limited to showing that the consideration that actually passed was sufficient, but may also present evidence of circumstances, salaries, financial contributions from other sources and relevant matters tending to prove that the ownership which was transferred was supported by adequate consideration.

---

on the property total only $267,674, the approximate amount of the debt to Chase Manhattan, holder of the first mortgage.

*Southern Slag*, 413 So.2d at 1076. The court went on to say:

> The grantee/spouse may present evidence tending to show that the original interest owned by the husband was a mere convenience and that the grantee/spouse initially purchased the property with funds from her own separate estate.

*Id.* The court noted that the husband's name was included on the deed to allow the couple to take advantage of a VA loan. The couple intended to change the title as soon as VA requirements would permit. The court concluded that the spouse had met her burden by proving that she "furnished all of the money at the time all of the real estate . . . was purchased, and furnished all of the money for the payments that were required to be made on the mortgage indebtedness. . . ." *Id.* at 1077.

*Champion* followed *Southern Slag* under similar facts. In *Champion*, the mortgage company had required the husband's name on the deed to enable the wife to assume the mortgage. *Champion*, 523 So.2d at 338. The wife had "made the down payment, all mortgage payments, improvements, and additions." *Id.* at 339. The court followed *Southern Slag* and held that the transfer to the wife was not fraudulent.

The facts in the instant case differ from the facts in *Southern Slag* and *Champion*. When the Clarks purchased the marital home in 2001, there was no intent that the home would be owned solely by Laura. They did not discuss putting the home in Laura's sole name until December 2002 – almost two years after they purchased the home. In addition, the home was purchased with joint funds, and the mortgage payments and renovation expenses were paid from a joint account, even though the money in that account was funded primarily by Laura. The evidence does not reflect the amount of money deposited either by Laura or the debtor.

The *Southern Slag* and *Champion* cases were decided prior to Alabama's current version of the Uniform Fraudulent Transfer Act, which was enacted in 1989. Section 8-9A-5(a) states that a transfer is fraudulent

if made "without receiving a reasonably equivalent value in exchange for the transfer." Therefore, the value must both be received by the debtor and made in exchange for the transfer.

The money that Laura paid for renovations after the October 2003 transfer was not received by the debtor. Neither did it inure to his interest because he no longer had an ownership interest in the property. The money that Laura paid for renovations before the transfer does not constitute legal consideration because it was made in the past. Moreover, *as between Laura and the debtor*, any money paid for renovations between December 2002 and October 2003 did not inure to the debtor's benefit because he transferred his interest to her in December 2002.

The court concludes that the debtor did not receive reasonably equivalent value in exchange for his interest in the marital home. Therefore, Laura is liable for the value of the debtor's interest on October 2003, subject to any legally allowable credits.

As stated above, another creditor brought a fraudulent conveyance action with regard to this very property back in 2004. Laura paid GAIC $170,000 to settle that action. She is entitled to a credit for that amount in the instant action because both actions are predicated on the same fraudulent transfer, the same cause of action. *See Bakst v. Wetzel (In re Kingsley),* 518 F.3d 874 (11th Cir. 2008).[15]

Conclusion

For the reasons stated above, the court concludes that the October 2003 transfer of the debtor's interest in the marital home to his wife, Laura, constituted an avoidable fraudulent transfer. A separate judgment will enter in favor of the plaintiffs and against Laura Clark in the amount of

---

[15] In that case, the bankruptcy court granted a credit for a prepetition repayment made by the transferee following an avoidable fraudulent transfer under 11 U.S.C. § 548. The Eleventh Circuit affirmed the bankruptcy court. *Id.*

$73,645.93, which constitutes the value of the debtor's equity in the home on October 29, 2003 minus $170,000 already paid by Laura in another action predicated on the same fraudulent transfer.

Done this 13th day of March, 2009.

/s/ Dwight H. Williams, Jr.
United States Bankruptcy Judge

c: Brent B. Barriere, Attorney for Trustee
Daniel D. Sparks, Attorney for GECC
Charles K. Hamilton, Attorney for Laura Clark
C. H. Espy, Jr., Attorney for Debtor